Good morning. May it please the Court, I'm Abram Zinberg, attorney for Appellate and Relator Anita Silingo. Appellate's QTAM action alleges various risk adjustment frauds against the Medicare Advantage program committed by the HMO appellees. FCA liability in Silingo's QTAM case is predicated on three fundamental Medicare requirements. First, each hierarchical condition code, also known as HCCs, submitted to Medicare is a claim for payment. Second, all HCCs must be supported by a properly documented medical record. Third, pursuant to 42 CFR 422.504 sub I, all Medicare Advantage contractors, such as the appellees, are statutorily liable to CMS for their first-tier contracting entities' frauds. That's the situation we have here. In ruling on the motions to dismiss against the SAC and the third amended complaint, the district court erroneously held that the appellant's allegations were defective group pleadings, that the appellant's literal false claims only applied to first-tier contractor MedExM and not against the appellees, that Appellate Silingo attempted to plead a violation of the FCA premised upon appellee's failure to implement effective compliance programs, and with regards to the motion to dismiss the second amended complaint, that Silingo abandoned her claims under the reverse false claim theory. Can you clarify something for me, please? You contend that the health care plans fail to maintain adequate compliance programs, as you just indicated, required by Medicare regulations, right? Yes. Okay. Are you suggesting that's a separate independent basis for liability, or is it merely a basis for your fraudulent certification claim? The latter. It is absolutely not an independent basis of liability, in our opinion. In that regard, you seem to suggest that the health plans did not meet their compliance obligations because if they had effective programs, they would have detected the fraud, and your opponent challenges that, what I'll call circular reasoning, as being insufficient to state a claim. What's your response? Well, I agree that that's what we're alleging, but we pled a number of facts. This is a situation of omission. They failed to do things, and the relator was present and involved and was able to see the things that they failed to do, such as have a hotline, educate the staff at MedExM to report fraud, that they won't be retaliated against fraud, do investigations with regard to the activities of MedExM and all of the requirements that are set forth in detail at 422-503-B4-6, as well as an entire chapter in the Medicare Managed Care Manual at Chapter 21, which sets forth detailed instructions on how to properly implement the compliance plan. Without effective compliance activities, this court held in Swobin v. U.S. Ex-Royal Swobin v. United Health Care Insurance Company that without exercising reasonable diligence, which it concluded meant minimally having effective, proactive compliance activities done in good faith by a qualified person, that the appellees have no basis for which to certify the risk adjustment data submitted based on their best information and belief. Can you point me to the sections in the third amended complaint where you believe you've adequately pleaded your literal falsity and expressed false certification? Oops. Oh, I apologize. I don't have the third amended complaint right here. But what the court held with regards to the motion against the second amended complaint was that the Rule 9 pleading requirements had been satisfied with regards to the eight business practices that were alleged that MedExM had improperly done and stated that the pleadings showed that it was clear that the pleadings had sufficient detail to demonstrate that it was more likely that it was likely that the appellee's defendant health plans submitted to CMS the purported fraudulent HCC risk adjustment data to CMS. Now, we agree with the court's conclusion with regards to those allegations as to MedExM. With regards to the allegations as to the defendant health plans, what we alleged is they knowingly submitted the risk adjustment data. Now, in order to do that, they needed to have a properly documented supporting medical record. This issue applies to 100% of the data that was submitted by the appellees. None of the assessments were properly authenticated and signed in accordance with Medicare's regulations. As such, they fail as a properly documented medical record that could be used to support the submission of risk adjustment data. All the appellees were aware of this because this defect is apparent on the face of the document, the document which they had in their possession along with the related diagnosis codes. Is that just a ministerial act that could be of no consequence? No, it is not. Medicare makes it clear that properly authenticating with a valid signature is a mandatory requirement for the medical record to be valid and that they will reject claims that cannot comply with that requirement. It's a situation of authentication. What MedExM did and what the appellees accepted was simply a typewritten name purporting to be the person, the medical provider, who performed the assessment. But anybody could have typed that name, and frequently people other than the medical provider did. And I take it at this early stage of the case, you don't know whether that's accurate or not, that the provider was, in fact, the person whose name appears on the documentation. As far as whether the provider typed it or not? As far as whether the service was provided? Well, we know of some instances where the service definitely was not provided, but the claim regarding we haven't had discovery to really flush it all out. What's the basis for asking for a Fourth Amendment complaint? It sounds like you want to be allowed the opportunity to amend the complaint a fourth time. Well, we would like to. . . Yes, we would like to be able to amend the complaint. I'd also like the court to reverse. . . No, but I'm asking you why. Why would you want to amend the complaint? What you hope to accomplish. Yes. That's not a trick question. No. I'm just asking, what are you trying to do that you haven't already set forth? If you think you've adequately set forth your complaint. . . Well, we'd like to bring back the reverse false claim that was left out as a result of the second amended complaint. The motion to dismiss the second amended complaint, the judge took the position that we had abandoned our reverse false claim theory. Isn't that true under Carvalho? I don't believe that. . . I'm not familiar with the holding in that case, Your Honor, but we believe that it was adequately pled. It was clearly related to the literal false claims against the appellees. The circuit has held that a party who fails to defend a claim on a motion to dismiss effectively abandons that claim. That's Carvalho in short order. So do you have some authority that says you can be silent and yet resurrect it? No, Your Honor. Do your allegations here hinge on collective allegations? No. The third amended complaint set forth all the allegations separately against each of the defendants. But there is no group pleading issue. We think the district court ruled in error. Recently in Swobin, this court addressed this similar issue regarding group pleadings and held that there is no pleading flaw when the allegations covering multiple defendants are addressed. Excuse me. When the allegations are that multiple defendants were engaged in precisely the same activity. In the second amended complaint, it was set out where they were engaged in precisely the same activity. In response to the court's order for the motion to dismiss, we set it out separately for each of the defendants. That was not viewed to be satisfactory by the court because it was identical. Word for word, conclusory paragraphs. Does Swobin say that that's okay? Well, I think it was a no, Your Honor, but I don't think that's a fair characterization. It's just it was the same activity, so it could be described the same way repetitively. Just as it could have been described correctly as we had done it the first time, which was a pleading that referred to multiple defendants engaged in the same activity. For instance, all of the defendants submitted the HCCs that were supported by the defective medical records. All the defendants submitted the HCCs that were obtained from nurse practitioners and physician assistants who were fraudulently practicing outside of their scope of practice. Those two allegations along with the false certification are the thrust of our complaint against the appellees. Did you want to reserve the balance of your time? Thank you, Your Honor. Good morning, Your Honor. David Levis on behalf of the defendants. This case ultimately boils down to a 9B dismissal, a straightforward 9B dismissal that should be upheld. The district court appropriately dismissed Relator's action on 9B grounds because Relator was unable, after four opportunities, to plead her False Claims Act claims with sufficient particularity as to the health plan defendants. The reason that I'm able to argue on behalf of all of these five groups of unrelated independent health plans is that her allegations, her generalized allegations, her allegations where she lumps the defendants together, all suffer from similar deficiencies. And I can, for efficiency's sake and to spare the court, I can make those arguments on behalf of these individually situated different entities. Tell us or tell me why this UnitedHealthcare case that came down subsequent to the district court's decision doesn't make this, the way that this is pled sufficient at this time regarding the collective allegations. So the Swobin holding. Yes. Sure. So the Swobin holding that Relator cites both in briefs and in argument today actually supports affirming dismissal here. In Swobin, this court found that the Relator's allegations against certain of the defendant health plans were similarly insufficient to satisfy 9B because the Relator in that case had failed to allege particular details of the scheme as applied to those defendants. Three of the defendants dismissals were upheld on appeal in Swobin, and the Swobin court reaffirmed this circuit's numerous cases rejecting False Claims Act claims that are based on broad and conclusory allegations. I could speak to the substance of Swobin, which concerns a different practice within the submission of diagnosis codes, but ultimately the Swobin holding on 9B is supportive of the defendant's argument here as well. Well, your opponent you just heard argued that if the same conduct applies to more than one defendant, it's sufficient to plead the same facts. You don't have to repeat or maybe ought not have to repeat them separately. You could lump them together and say each of these defendants committed each of these acts, A, B, C, and D. Why isn't that? There are a couple problems with that leap of logic. More efficient to do it that way. It is. 9B doesn't allow it. 9B gives the defendants the opportunity in a case sounding in fraud to know the who, what, when, where, and how of the scheme that they're alleged to have participated in. In a False Claims Act case, the scheme has to involve the knowing submission of false claims to the government, false claims for payment. To argue that. They've alleged a knowing submission of false documents. They've alleged on assumption, the inference, that because these five groups of defendants who Relator has identified had contracts with MedXM, that therefore they must have submitted false claims to CMS based on the deficient diagnosis, diagnoses that MedXM prepared. Relator hadn't. Shouldn't we, I'm sorry to interrupt you, Shouldn't we wait until we do a little discovery to find out if, in fact, that, as you call it, assumption is true or not? Well, we shouldn't wait. 9B tells the courts that we can't wait where a Relator is simply piling inference on speculation in order to haul defendants in and accuse them of fraud. If you look at the allegations, the factual allegations in the Second Amended Complaint, the Third Amended Complaint, they're all about the conduct of MedXM. Relator had inside information about MedXM. Relator has no similar information about the processes of the health plans that contracted with MedXM, so she merely assumes that they received these defective diagnoses, these defective health assessment reports from MedXM, and they must have submitted the diagnoses wholesale to CMS without scrutinizing them, without taking any extra steps. It's those assumptions that are insufficient in constructing a False Claims Act fraud claim in order to proceed to discovery. She can't do that based simply on her assumption that it must have occurred without any sort of specific allegations about the processes, the individuals involved, the time frame. That's where it's inappropriate. Even if her theory is that each of the defendant health plans similarly submitted false claims, they're separate entities, they have separate business practices, separate structures, separate populations. Her complaint suggests that each one of these separate entities identically responded to the materials that they received from MedXM and submitted false claims. And the statement in Swoboda, is it Swoban? Swoban, would it be, Swoban. United Health Care, yes. It seems like the court there clarified there is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are all alleged to have engaged in precisely the same conduct. So why doesn't that apply here now at this time? Well, I would acknowledge that that language suggests an opening here, except that the Swoban court in that same decision determined that three of the defendants about whom this group pleading was alleged, that the allegations were not sufficient to proceed. So I don't think that language puts Swoban at odds with the other precedent in this circuit that holds that it's inappropriate to... I thought that in Swoban, there were claims against two health insurance companies that were allowed to proceed. Correct. Okay. But not for the same reasons as here, you're arguing? Well... I'm just trying to understand. Maybe you can tell me, just give me your best explanation as to why that should be distinguished from this case. Sure. I guess two separate issues. The reason that the Swoban court identifies for allowing the claims to proceed against two of the defendants is that Swoban was able to identify with some specificity the type of software that a health plan used in order to evaluate its chart review. There were other individual facts or alleged facts that the court pulled out of the complaint that were sufficient. When I was distinguishing Swoban substantively for involving different processes, what I meant was that the Swoban allegations concern a practice known as retrospective chart review. It's when some health insurance plans look at medical records to determine whether they support additional diagnoses for their members for whom the plans are being reimbursed by Medicare. This case, these allegations concern what's called in-home assessments, where MedExSim was retained to visit with patients at their homes to evaluate their conditions and to provide reports of those conditions to the health plan. So what Swoban contended was wrong in the Swoban case concerned looking back at records after the fact to try to derive new codes. And Swoban alleged that several of these defendants had deliberately designed their review process to avoid discovering diagnoses that were unsupported. The Swoban court held that if that were true, that that could be, in fact, a violation of the False Claims Act. That's a completely different practice from what we're discussing here. It's unrelated to the in-home assessments and the care regimens that they support. So that's what I was trying to distinguish the substances for. And so are you saying that the allegations that they set forth here, Zalingo, may have been sufficient against MedEx but not against your clients? Well, the district court found that they were potentially sufficient against MedExSim, even though MedExSim was not the one submitting claims to the United States. The district court distinguished that they were not sufficient as to the individual health plans because Zalingo has not alleged anything about the processes that these plans had in place after they received what Zalingo contends were deficient diagnoses. And we contend that that was, in fact, a fair reading of what NIBE requires. It's possible that she can allege problems with MedExSim's processes, that MedExSim may have generated diagnoses that were unsupported, and yet that's not enough to get to the knowing submission of a false claim. She still has to be able to allege something about what the plans, and allege more than simply assuming that they submitted these diagnosis codes wholesale to CMS. That's what she's done. She hasn't given the plans any sense of what she contends their processes were, what was wrong with the processes, except to say that because they didn't discover in her allegations what MedExSim had done, therefore their compliance was deficient. Did Swobin involve second-tier players, like in this case? I call you, or he calls you, second-tier players. So I don't know whether the chart review contractor in Swobin was technically a first-tier or a second-tier player, but it was, in fact, a contractor from outside the insurance company. I think the characterization of compliance requirements for downstream entities is a bit of a distraction here. Salingo attempts to use a discussion of CMS's requirements for what health insurance plans need to have in place, their own compliance programs, to argue that there was a wholesale failure of compliance here. Unfortunately, that theory has to fail as well, because all the complaint alleges with specificity is a recitation of the different regulatory requirements. There's nothing in there about what these plans did in terms of compliance or, for that matter, what specifically they did wrong. But isn't it, I guess I mean, is it sufficient that, you know, all the appellees here relied on the same assessments produced by Medics and that were, I guess, undisputably submitted to CMS? Well, they can't have been the same assessments, because each of these defendant plans has different members who have insurance through their plan. An in-home assessment involves one individual member. So it can't be that two plans receive the same deficient in-home assessments. It's conceivable that Salingo is alleging that there were similar problems with all of the assessments that went to all the plans, but there are no allegations to suggest even what assessments went to individual plans and what problems an individual plan had to contend with. The problem here that's ultimately fatal to Salingo's complaint against these plans is she has inside information about what MedExM did. She has no such familiarity with what the plans did with whatever they received from MedExM. And we can't simply assume that because she knows that there were problems or she can allege that there were problems with what MedExM produced, that we can't go from that assumption to a fair assumption that each plan received those and submitted them to CMS without taking any further action. Can you tell me in plain English what the benefit would have been to your client to engage in the conduct as alleged? To engage in the conduct as she alleges it? Yes, as is alleged here. That they, you know, rubber-stamped, they didn't do whatever it is they were supposed to do. I mean, you know, broadly speaking, Medicare reimburses insurance plans under Medicare Advantage for taking on the risk of caring for beneficiaries. They're paid on a prospective basis, and the amounts that the plans receive are adjusted to reflect how sick a patient is. So plans have an incentive to make sure that their patients are properly diagnosed, because they're on the hook for paying for all the treatment of a patient, whether Medicare is aware of those diagnoses or not. That gives both the insurance plans and CMS an incentive to make sure that patients are properly diagnosed, and it's why CMS has been supportive in at least two call letters of the benefit of in-home assessments, that they're designed to evaluate patients in the home and make sure that their medical records are, you know, complete and comprehensive. Thank you. You're welcome. Judge Gould? Counsel, I have a general question, and that is it seems like a lot of other False Claims Act cases I've seen, we've thought there wasn't sufficient particularity or plausibility to let a complaint go forward. However, my question is, in this case, you know, given the allegations that are made, and this Swobin case saying that one can make allegations against a group collectively if they all do the same thing, why shouldn't there be some level of discovery in the case after which the health care plans could move for summary judgment A couple points, Your Honor, and I see I'm out of time, so if you'll indulge me to respond. I think that this goes back fundamentally to what Congress had in mind when it passed the False Claims Act during the Civil War and when it's amended it many times since, and that was to incentivize whistleblowers with inside knowledge about contractors who are defrauding the government, to incentivize them to bring that forward. At the same time, Congress and the courts have recognized that False Claims Act allegations sound in fraud, and a defendant shouldn't be held to have to defend allegations of fraud without some level of specificity to put the defendant on notice of the scheme in which they're alleged to have participated. The Swobin case, again, stands for a continuation of the principle that a relator still needs to be able to allege with particularity the who, what, when, where, and how that would put the defendant on notice before she gets to proceed with the case, before putting the defendant to the cost of having to defend itself or even of discovery. That's why this court in Swobin upheld dismissal with respect to three of the defendants for whom there had not been sufficient specificity and reversed it with respect to the other two. And in that regard, I don't think Swobin's holding is inconsistent with this court's many other holdings, such as Corinthian Colleges, Bly McGee, Cafaso, where the court has said, Corinthian Colleges in particular, where you had multiple individual defendants who were part of the same organization, and yet the court found that it was insufficient to generally plead the allegations against them, that the relator had to allege for those specific individuals who were part of the Corinthian Colleges operation, had to allege with sufficient specificity to put them on notice. Here we have five different groups of defendants that have no relationship with one another, except for the fact that they all happened to have separate business contracts with MedExM, about which the relator did have some knowledge. So if there was only one defendant, would that have been okay, instead of five? Would that have been sufficient? That might have addressed the group pleading problem, but the relator would still have to be able to allege something about that plan's processes. What is it that she contends they did with the deficient health assessment forms they received from MedExM? What is it she contends, beyond saying on assumption, they submitted the diagnoses to CMS? She knows nothing about those processes, and therefore can't allege anything about them, and that's why even when Judge Murguia asked what would happen if allowed a fifth opportunity, what would you add? Counsel had no new facts to add. I don't want to go there, but let me, if I can, ask this last question. Let's keep it with where we have the pleadings now. We won't go to the fourth. The allegation is that the health plan certified the data, the RED, however you call that, despite knowing that MedExM assessments were not properly authenticated, something that they claim was apparent on the face, and at least some assessments were performed by unqualified providers. Specific enough for you? No. Why not? Because the leap from MedExM's health assessment forms to the submission of risk adjustment data, RADS data, is a leap of logic for which she has no basis. She's assuming and she's asking the court to assume that because these plans received data that she says was deficient, therefore they must have submitted diagnosis codes based on that deficient data to CMS, when in fact many of these beneficiaries see multiple providers. Maybe they're diagnosed with the same condition by their primary care provider, so maybe the plan never even bothered to submit what it received from MedExM, because that condition has already been documented elsewhere. That's not a leap that the court can make based on the assumption that it must have happened. There has to be specificity. So what would have had to have been pled here to be able to go forward, especially under the collective assessment sort of ruling that just came out? It's a fair question. I'm not in the business of drafting QUTAM complaints, but I'll put my head on that side for a moment. Give me a better idea of what was deficient, because you're saying that it's still deficient, even after the UnitedHealthcare case. Sure. There would need to be some allegations, specific allegations about the processes that go on at a defendant health insurance plan that is under contract with MedExM. What does Salingo know that a plan does when it receives these health assessment forms that she says are defective? How do they analyze them? Do they extract diagnoses and convert them to diagnosis codes and submit them to CMS? What is deficient about that review process that they didn't pick up on the problems that she says were self-evident? None of that is here, because she has no knowledge of those processes, and that's essential in order to satisfy 9B. It would also help to have identification of some individuals. The who, what, when, where, and how typically involves a who. And then if they did that for one plan, then all the other plans would come in? I'm sorry, I didn't mean to interrupt you. I don't think all the other plans could come in on that, because unless all of the plans involve the same personnel, the same processes, these are different insurance companies. They have different structures, different populations. How can she say simply because they all had a contract with her former employer, and she knows that her former employer did things wrong with the health assessment forms, that every insurance plan or every one that she's named here must have done the same things and must have submitted codes to CMS based on that deficient work? That's not enough to satisfy 9B. Are there any other questions, Judge Kuhl? I don't have other questions right now. Thank you, Your Honor. Thank you. I'd like to answer one of the questions that was asked. What would be the effect if things happened the way the appellant alleged? What's the consequence to the health plans? It's very simple. They make more money. They're engaging MedXM because MedXM is sending various medical providers into people's homes to document illness, and certain illnesses generate HCCs, which become risk adjustment data. The risk adjustment data is submitted to CMS, and that is the basis of their payment. And does Medicare review that for approval? No, Medicare accepts it because the data has been certified by the health plan. It's a little specious to say that they're not submitting the data. The whole point is that they are submitting the risk adjustment data. Selingo is not an insider in those companies, but she certainly knows what MedXM is doing, and certainly can attest to the interactions between those companies and MedXM. And it wasn't about making any of it accurate. It was about getting risk adjustment data to these health plans, and if MedXM did that, their contract expanded. And their contracts have expanded in an exponential way since they started this company. Now, there was a lot of sort of circular talk about Swobin. Swobin didn't deal with first-tier contractors. It dealt with the health plans engaging directly in this retrospective review. The problem with the first-tier contractors that's being overlooked is the health plans sort of step into their shoes. Their contract with CMS and the CFRs require that. They are ultimately responsible, regardless of what their contract says with MedXM. The health plans are ultimately responsible to ensure that all CMS regulations are complied with. That's how come they all engaged in the same activity. The activity is submitting the fraudulent data to CMS. We don't need to know in detail their processes or what they did, how they processed this piece of paper, or what reviews they did. We know what they didn't do. They never said anything about the invalid supporting medical record, the assessment. They never said anything about the invalid assessments from the nurse practitioners and the physician assistants. There was another instance where Melina, Appellant Melina, noticed that all of the assessments had duplicate data, over 700 of them, all done by the same doctor. Different names, but all the data was the same. They called up and said, fix it. They knew it was an obvious fraud, this Dr. Awasi, who was seeing 25-some patients a day. Instead of investigating the potential fraud like they're supposed to do, they said, could you please send us some data that looks better? A few weeks later, MedXM creates new data. They created it fraudulently. They called people on the phone and asked them questions and had Dr. Awasi and other people help fill in better looking reports and told the health plan, oh, some kind of printer malfunction. Put specific identical data on all these different assessments. All done. They didn't use their compliance program. MedXM had not had any experience in Medicare prior to 2010. They don't know what they're doing, but all these major health plans have contracted with them to do this complicated thing. They're getting it wrong all the time. But the health plan has this fraudulent report purportedly signed by a doctor that they can look the other way on and submit. And that's what's been going on here. That's what this case is about. Thank you very much. Appreciate your arguments and your presentation, both of you here today. Mr. Zinberg, I just speak for myself. When we're here and the whole focus is on your last complaint, I think you'd be well served to have it handy and ready to go and be able to refer to it. So in the future, you may want to consider that. Thank you, Your Honor.
judges: Gould, Murguia, Zouhary